# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs September 20, 2016

## STATE OF TENNESSEE v. TERRY VONNER

**Appeal from the Criminal Court for Knox County**
**No. 99517     Steven W. Sword, Judge**

---

**No. E2016-00019-CCA-R3-CD – Filed October 18, 2016**

---

The Defendant, Terry Vonner, was convicted by a Knox County Criminal Court jury of attempt to commit second degree murder, a Class B felony; reckless endangerment, a Class C felony; and employing a firearm during the commission of a dangerous felony, a Class C felony. *See* T.C.A. §§ 39-13-210 (2014) (second degree murder), 39-13-103 (Supp. 2012) (amended 2013) (reckless endangerment), 39-17-1324 (2010) (amended 2012) (employing a firearm during the commission of a dangerous felony), 39-12-101 (2014) (criminal attempt). The Defendant also pleaded guilty to unlawful possession of a firearm, a Class E felony. *See* T.C.A. § 39-17-1307(b)(1)(A) (2010) (amended 2012, 2014). The trial court sentenced the Defendant to serve an effective sentence of fifty-one years. On appeal, the Defendant contends that the trial court erred by not placing more weight on the mitigating evidence presented at the sentencing hearing. We affirm the Defendant's convictions, but we remand for the entry of a corrected judgment in Count 2, employing a firearm during the commission of a dangerous felony, to reflect 100% release eligibility.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed;**
**Case Remanded for Entry of Corrected Judgment**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

Keith Lowe, Knoxville, Tennessee, for the appellant, Terry Vonner.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Charme P. Allen, District Attorney General; and TaKisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to a January 26, 2012 attack in which the victim, Althea Pope, was hit in the head with a machete and shot four times. The machete attack occurred at the victim's house, and the shooting occurred outside a neighbor's house. The neighbor's house was occupied by a woman and her two-year-old daughter, and the house was struck by several bullets.

At the trial, Knox County Emergency Communications records specialist Michael Mays testified that Knox County 9-1-1 received two telephone calls on January 26, 2012, relating to the case. Recordings of the telephone calls were received as an exhibit, and the record reflects that the recordings were played for the jury, although the recordings are not contained in the appellate record.

The University of Tennessee Medical Center records custodian Cheryl Green provided the victim's medical records, which were received as an exhibit but are not contained in the appellate record. Ms. Green testified that the victim was admitted to the hospital on January 26, 2012, and was discharged on February 8, 2012.

Knoxville Police Department forensics evidence technician Beth Goodman testified that she took photographs of the crime scene, which consisted of two houses and an apartment, collected blood samples, and collected a "rubber grip from a pistol" found in the yard in front of the victim's house. She identified an aerial map of the neighborhood in which the attack occurred and identified the location of the apartment to which the police reponded and the location where a bicycle and a weapon were recovered. Ms. Goodman said that she collected spent .22-caliber cartridge casings near the mailbox of the neighbor's house, photographed bullet strikes on the front of the neighbor's house, and collected blood from the front porch of the neighbor's house. She stated that one bullet penetrated the exterior wall, traveled through a sofa inside the neighbor's house, and struck an interior wall. She identified photographs of the crime scenes, which were received as exhibits.

Knoxville Police Officer Simmons[1] testified that he recovered a bicycle and a rifle lying beside a building. He said that the stock of the rifle was engraved with the name "C. Pope."

Keyana Stevenson testified that on January 26, 2012, she lived at her grandfather's house with her two children, her mother, her sister, and her dog. At about 6:30 p.m., she was taking a nap with her two-year-old child when her dog barked and someone pounded on the

---

[1] The officer never identified his first name.

front door. Ms. Stevenson noticed that the front of the house was smoky as she went to the door, and a woman on the front porch told Ms. Stevenson through the door that she had been shot and asked for help. Ms. Stevenson did not open the door, but she ran to the kitchen and called 9-1-1. The woman was not on the porch after Ms. Stevenson spoke to the paramedics. Ms. Stevenson's six-year-old daughter was not home. No one in the house was injured, but the bullet entered the house during Ms. Stevenson's nap. Ms. Stevenson did not hear yelling or anything to indicate a person was chasing the woman.

The victim testified that she had known the Defendant for about ten years, that in 2012, they were in a romantic relationship, and that on January 26, 2012, the Defendant had spent time with the victim at another location before walking home with her. She and the Defendant did not have a monogamous relationship, although the Defendant wanted one. The victim and the Defendant stayed overnight at her house sometimes. They did not discuss their relationship on the day of the attack. The victim knew that the Defendant was homeless and worked odd jobs.

The victim told the Defendant she had to leave the house in order to babysit her grandchildren and that he would have to leave when she did. The victim cooked dinner, but the Defendant did not want to eat. The victim said that she ate in her bedroom and watched TV and that the Defendant watched her eat. She stood by the end of the bed when she finished eating, and the Defendant hit her in the back of the head with a machete. The Defendant was not holding a gun when he swung the machete at her. The victim denied having argued with the Defendant or having any conflicts with him. The Defendant had brought the machete to the house previously, and the victim had asked him to keep it outside.

The victim asked the Defendant if he hit her, the Defendant responded affirmatively, and the Defendant drew back his arm as if to hit her again. The victim left because she knew the Defendant would have killed her if she had stayed inside the house. The victim said, though, that the Defendant never said he was going to kill her.

The victim ran to a neighbor's house, but the neighbor would not allow her inside. The victim asked the neighbor to call the police. The Defendant followed the victim, stood in the middle of the street, and shot at the victim. The Defendant said something unintelligible and shot the victim in the back four times. The victim felt out of control because "he was trying to take my life and . . . [there was not anything] I could do."

The victim identified a photograph of her deceased husband's rifle as the gun the Defendant used to shoot her. The victim's deceased husband's name was Clifford Pope, and the victim kept his rifle in her bedroom.

-3-

The Defendant walked away after shooting the victim, and the victim fled to a friend's apartment. The friend called 9-1-1. The victim required sutures on the back of her head. She was shot three times in the lower back and once in the buttocks. The victim said that she had lasting effects in her mind from the attack. After the attack, the Defendant did not communicate with the victim.

The victim agreed that she could not outrun the Defendant and that if he had wanted to catch the victim before she reached her neighbor's house, he would have been capable of it. The victim considered the Defendant's mental state "all right." She thought the attack was unexpected and out of the ordinary.

Elizabeth Large testified that on January 26, she hosted a Bible study attended by her brother, mother, and two other men. Ms. Large heard the doorbell and knocking at the door. Ms. Large's brother opened the door, and Ms. Large saw the victim. Ms. Large did not know the victim, who was panicked and wearing bloody clothes. Ms. Large's boyfriend knew the victim. Ms. Large's brother stepped outside to call 9-1-1, and Ms. Large and the others helped the victim inside, where she sat on a stool. The victim's back was covered in blood, and the victim went in and out of consciousness. The victim asked to use a telephone and called her daughter. Ms. Large heard the victim say that she had been shot, that "[he] hit me with a machete," and that "it was him." The victim mentioned the Defendant's name.

Ms. Large stepped outside to meet the responding police officers. Ms. Large saw the victim's skull through the head injury and saw a bullet wound on the victim's right side. Paramedics responded to the scene and took the victim to the hospital. Ms. Large did not know how the Defendant was associated with the victim. After reviewing a previous statement, Ms. Large said that after talking with a person who knew the victim, Ms. Large thought the Defendant was a homeless man the victim was helping. Ms. Large said, though, the victim never told her this.

The Defendant testified that he grew up in Knoxville and spent most of his childhood in group homes and Spencer Youth Center. The Defendant experienced violence as a child and his mother drank alcohol and went to clubs. His brother used drugs, and the Defendant began drinking alcohol and smoking marijuana at age thirteen. The Defendant had memory problems and did not remember everything about the date of the offense. The Defendant and the victim had been in a romantic relationship for about four months, and he stayed at the victim's house most nights. Otherwise, the Defendant was homeless. The Defendant contributed to the household financially by doing odd jobs in order to pay for the victim's groceries. The Defendant loved the victim and wanted an exclusive relationship with her, although he knew she saw other men, which upset him.

The Defendant said that on January 26, he arrived at the victim's house around 6:00 p.m. The victim was in the bedroom getting dressed, and the Defendant saw the closet door "doing a tidal wave like somebody [was] in there." The Defendant asked the victim if she had seen the closet door move, the victim told the Defendant he needed to leave for a few minutes, and the Defendant left the bedroom and made himself a sandwich. The victim told the Defendant not to cook anything because she had already made dinner. The Defendant described his mental state as "highly p----- off." He said that he took a bite of the sandwich, said, "F--- this," grabbed his machete, went into the bedroom, and hit the victim in the head from behind.

The Defendant said that he tried to hurt the victim, that he did not think he had because she did not fall down or react to being hit, that she turned around and asked if he hit her, and that the victim pushed the Defendant and ran out the door. No one emerged from the closet, and the Defendant did not look inside the closet because he was afraid of being shot. Most of the men who visited the victim carried guns.

The victim ran, stood in the middle of the street, and yelled for help. The victim looked toward her house as she yelled, and the Defendant assumed she was asking the man in the closet for help. The victim squatted behind a neighbor's pickup truck, but a portion of her was still visible. The Defendant threw the machete in the yard, returned to the house, and retrieved a rifle the victim kept inside her bedroom closet. The Defendant did not notice the victim's blood inside the house because it was dark. The Defendant knew he was not permitted to possess a gun due to his prior felony convictions. The Defendant forgot about the man in the closet when he retrieved the rifle, although he said that his purpose in taking the rifle was to "keep somebody else from getting it that's in the closet." The Defendant denied planning to shoot the victim when he retrieved the rifle.

The Defendant returned to the street, where the victim was still hiding behind the truck, and he "shot her in the a--." The Defendant thought the shot would only wound her. He did not think he struck the victim because she did not cry out. The victim ran, and the Defendant followed her on his bicycle. When he caught up to her, she was standing on the front porch of a house about a five-minute walk from the victim's house and was beating on the front door. The Defendant did not think that anyone was inside the house.

The Defendant said that he aimed the rifle at "her a--," that he shot at her until he ran out of ammunition, that the victim ran back and forth on the porch dodging the bullets, and that he did not think he struck her because she did not scream, fall down, or bleed. He said that it was dusk outside and was difficult to see. The Defendant denied aiming for anything other than the victim's buttocks and wanting to kill her. The Defendant acknowledged that shooting another person in the buttocks was wrong. The Defendant acknowledged the

-5-

victim's medical records reflected gunshot wounds to the right flank, right hip, and left groin and a laceration to the posterior skull.

The Defendant said that he was "fed up" with the victim's having other men in the house and that he was angry when he shot at her. The Defendant said that he left the house and rode his bicycle until he hit a manhole cover and that he threw the gun and the bicycle against a nearby building. The Defendant knew the police were coming and continued walking away. The Defendant knew he was wrong and was worried about the victim's brothers seeking retribution. The Defendant never contacted the victim after the shooting because he did not think she would want to talk to him.

The Defendant denied having gone to another location with the victim earlier in the day and walking back to the victim's house. He denied that the victim told him she was going to babysit her grandchildren and needed to leave. The Defendant knew the victim had grandchildren, but they did not discuss them. The Defendant did not see the person in the closet or hear the person say anything, but the Defendant saw the closet door move and knew "it wasn't no ghost in there." The Defendant did not ask the victim if someone was in the closet. The Defendant initially said he saw one man visit the victim, although he later said he saw three men visit her over a four-month period. The Defendant could not say whether the victim had a relationship with the men or whether she had sex with them in exchange for money or property. The Defendant did not see her have sex with the men but presumed she did.

Knoxville Police Investigator Colin McLeod testified that generally, the police department did not endorse defendants' contacting victims and that had the Defendant contacted the victim, he would have used it as evidence against the Defendant. Investigator McLeod responded to the crime scene and saw the victim, who had blood on her head and abdomen and had intermittent responsiveness. Investigator McLeod searched for the Defendant and helped the crime scene investigators process the victim's and Ms. Stevenson's houses. Investigator McLeod did not find any people in the victim's house. Investigator McLeod was unable to interview the victim while she was in the hospital because she had been placed in a postoperative medically-induced coma.

The victim testified on rebuttal that on January 26, she did not have a man in her closet. She said that during her relationship with the Defendant, the victim entertained friends at her house and that they played dominoes and card games and drank socially. She denied that she entertained men in her bedroom and that they gave her money or property. The victim stated that she believed the Defendant had mental health issues and that he had previously stated to her that he thought men were in her closet. The victim denied being shot at while hiding behind a truck. She did not know why the Defendant assaulted her.

-6-

Upon this evidence, the Defendant was convicted of attempted second degree murder, employing a firearm during the commission of a dangerous felony, and reckless endangerment.

At the sentencing hearing, the Defendant testified that he was removed from his mother's custody when he was age seven or eight, that "people at John Tarleton Home" picked him up from school, and that he did not see his mother again until he was age fifteen. The Defendant said that he stayed at John Tarleton Home for two or three years. He said that afterward, he went to Spencer Youth Center but returned to the "house" for about four months until he moved out at age fifteen. The Defendant stated that he lived with a girl and that he sometimes lived "on the street." The Defendant acknowledged that he had legal troubles and that he began using drugs and alcohol at a young age. The Defendant stated that he began smoking marijuana at age seven without his parents' knowledge and that he began drinking alcohol at age thirteen. The Defendant said that at the time of his testimony, he heard voices and that he had been hearing them for a while. The Defendant stated that he received mental health treatment for the first time at Spencer Youth Center or at "Lakeshore." The Defendant remembered being committed into State custody at age thirteen. He stated that he lived with his parents once after he was age fifteen, although he did not remember for how long. The Defendant said that he went to "Nashville Recovery" for drug rehabilitation for about four months and that he left before completing the program because of relationship trouble.

On cross-examination, the Defendant testified that he received drug and alcohol treatment at the Tennessee Department of Correction (TDOC) in the form of substance abuse classes and that when he was released, he chose not to attend substance abuse support group meetings. The Defendant said that he heard voices intermittently while in the TDOC and that he did not seek mental health treatment. The Defendant stated that after his release, he did not seek his family members, including three sisters, and that his mother died in 2000. The Defendant said that he had not seen his siblings in two or three years. The Defendant stated that he had a home when he was released on parole.

The Defendant testified that while he was in the TDOC, he believed "they were putting gas in my cell through the . . . drain pipe, to make me go to sleep so they could hang me." He said that as a result, he set fire to his bed in order to "blow the whole place up." The Defendant said that his part of the prison was evacuated and that other inmates were present. The Defendant stated that he did not remember the last time he was employed and that he previously performed "labor." He said that when he was not incarcerated, he worked in order to be able to buy cocaine.

-7-

The presentence report, which was received as an exhibit, reflected that the Defendant was age forty-eight and that he had previous convictions for multiple assaults, evading arrest, unlawful weapon possession, theft, and aggravated robbery. The Defendant reported drinking a pint of wine daily at age thirteen and a quart of wine daily at age fifteen, but he said he consumed less alcohol after age twenty-three. The Defendant reported "huffing" paint weekly between ages eleven and thirteen, daily crack cocaine use between ages twenty-four and forty-four, and daily marijuana use between ages seven and forty-four. The Defendant reported a depression diagnosis and taking depression medication. He reported taking medication for hearing voices, but he did not remember the name of the medication and said he had never received a diagnosis relative to hearing voices.

Judgment forms for a 1997 theft conviction and 1991 convictions for aggravated robbery and four counts of aggravated assault were received as exhibits. A 1991 presentence report, which was received as an exhibit, contained the Defendant's juvenile record, which noted an adjudication for "felonious assault." A 2007 petition to revoke probation was received as an exhibit.

The trial court considered the evidence presented at the sentencing hearing, the presentence report, the purposes and principles of sentencing, and the evidence presented at the trial. Relative to mitigating factors, the trial court credited the Defendant's testimony regarding his childhood, noted the contents of the presentence report about the Defendant's early years, and found that the Defendant was "entitled to some degree of mitigation in these offenses. His life did not start out well, and he was fighting an uphill battle his entire life." The court found, though, that the Defendant had many opportunities to "change the direction of his life" but had failed to do so and that as a result, the court placed little weight on the mitigation evidence. The court found that the Defendant had established mental health issues and that they merited consideration relative to mitigation.

The trial court applied enhancement factors (1), (6), (8), and (16). *See* T.C.A. § 40-35-114(1) (2010) (amended 2012, 2015, 2016, 2017) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"), 40-35-114(6) ("The personal injuries inflicted upon . . . the victim [were] particularly great"), 40-35-114(8) ("The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community"), 40-35-114(16) ("The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult"). The court found that the Defendant had a significant criminal history beginning when he was a juvenile and that because the Defendant's most serious convictions were used to establish his status as a Range III offender, the court afforded this factor only "some weight." The court noted that the Defendant had admitted using narcotics for most of his adult life and that this was entitled to

-8-

some weight as evidence that the Defendant had engaged in criminal behavior for much of his life. Relative to enhancement factor (6), the court noted that the victim's injuries were particularly great, that the victim was struck multiple times in the pelvic area and stomach, and that the victim testified about the impact of her injuries. Relative to enhancement factor (8), the court found that the Defendant previously had absconded while on parole and that his parole had been revoked twice, indicating that he would not comply with the terms of community release. Relative to enhancement factor (16), the court found that the Defendant had a felony juvenile record but that it placed little weight on this factor due to the passage of time since the offense.

Relative to consecutive sentencing, the trial court found that the Defendant had an extensive criminal history, which included multiple convictions for violent behavior and unlawful weapon possession, and that the Defendant had shown himself to be a threat to the lives and property of others. The court noted that this factor alone was enough to merit consecutive sentencing. Relative to the Defendant's being a dangerous offender whose behavior indicated little or no regard for human life and having no hesitation about committing a crime in which the risk to human life was high, the court noted the "extremely aggravated" circumstances of the offenses, including the Defendant's testimony that he was enraged by the belief the victim had a man in her bedroom closet, the Defendant's hitting the victim in the head with a machete and shooting her, the Defendant's matter-of-fact demeanor when recounting the attack, the time it took the Defendant to retrieve the rifle, the fact that he was "hunting" the victim on his bicycle, and the court's belief that the Defendant should have been convicted of attempted first degree murder. The court found that the Defendant disregarded the lives of the victim and of the people in Ms. Stevenson's house. The court noted that the Defendant committed robbery at gunpoint in 1991 and that the Defendant's behavior in 1991 and in the present case showed little regard for human life. The court found that confinement for an extended period of time was necessary to protect society and was reasonably related to the seriousness of the offense. The court noted the Defendant was age forty-eight and its belief that the Defendant was still capable of causing serious harm to members of the community. The court found that consecutive sentencing was justified.

The court found, given the enhancement and mitigating factors presented, that sentencing the Defendant to the maximum sentence and running the sentences consecutively was excessive. The court sentenced the Defendant to twenty-seven years for the attempted second degree murder conviction and to twelve years for the employing a firearm during the commission of a dangerous felony conviction and ordered consecutive service pursuant to statute. *See* T.C.A. § 39-17-1324(e)(1) (2010) (amended 2012). The court sentenced the Defendant to six years for the unlawful possession of a firearm conviction and ordered concurrent service with the employing a firearm during the commission of a dangerous felony conviction. Relative to the reckless endangerment conviction, the court noted that the

people inside Ms. Stevenson's house were endangered by the Defendant's conduct and sentenced the Defendant to twelve years to be served consecutively to the employing a firearm during the commission of a dangerous felony conviction. The total effective sentence was fifty-one years as a Range III, persistent offender.

The Defendant contends that "the court below reached an illogical conclusion" when it determined that the Defendant's mitigating evidence related to his childhood was not entitled to great weight. The Defendant argues that his early drug use, mental health problems, and teenage homelessness "are not the kind of difficulties that simply go away with time" and that without substantial assistance and resources, "the probability that a severely mentally impaired individual can simply 'change the course of their life' . . . is extremely low."

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id.* A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-

115(b)(1)-(7) (2014). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed," and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

The trial court considered the appropriate purposes and principles of sentencing, articulated its reasoning in applying each enhancement and mitigating factor, and stated the weight it gave each factor. Relative to the Defendant's childhood, the court found that the Defendant was entitled to "some degree of mitigation" due to the "uphill battle" he had faced his entire life. The court noted the Defendant's mental health issues, acknowledged they likely played a role in the offenses, and found that they merited consideration. The court found, though, that the Defendant had many opportunities to "change the direction of his life" but had failed to do so and concluded that the Defendant's past circumstances did not merit great weight. The court found, and the record reflects, that the Defendant committed a violent crime, that the circumstances of the offenses were aggravated due to a disregard for human life, and that the Defendant's extensive criminal record included other instances of violent crime and an inability to abide by the terms of release into the community. The trial court properly applied four enhancement factors, finding that the enhancement factors outweighed the mitigating evidence presented at the sentencing hearing, and ordered the Defendant to serve within-range sentences. Likewise, the court imposed partial consecutive service based in part upon the Defendant's extensive criminal history. The court also found that the Defendant was a dangerous offender whose conduct indicated little to no regard for human life and who had no hesitation about committing the crime when the risk to human life was high. The court also found that consecutive service was reasonably related to the severity of the offense and was necessary to protect society from the Defendant. *See Pollard*, 432 S.W.3d at 863-64; *see also State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). The record supports the court's findings and conclusions. The court did not abuse its discretion, and the Defendant is not entitled to relief on this basis.

We note that in the judgment for Count 2, employing a firearm during the commission of a dangerous felony, a box reading "Persistent 45%" is marked under release eligibility. Our review of the record indicates that although the Defendant was properly determined to be a Range III, persistent offender, the Defendant's release eligibility is governed by Code section 39-17-1324. Therefore, we order correction of the judgment in Count 2 to reflect the Defendant's release eligibility as "39-17-1324(a), (b) 100%."

In consideration of the foregoing and the record as a whole, we affirm the Defendant's convictions but we remand for the correction of the judgment in Count 2.

_____
ROBERT H. MONTGOMERY, JR., JUDGE